FILED

Jul 28 2017, 9:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

Randy Head
Tribbett Law Office
Logansport, Indiana

Jeffrey D. Stanton
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: Ale.P., Ala.P., and J.P., Children Alleged to be in Need of Services, <br><br> C.R. and A.R., <br><br> *Appellants-Petitioners*, <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Respondent*. | July 28, 2017 <br><br> Court of Appeals Case No. 52A02-1612-JC-2864 <br><br> Appeal from the Miami Circuit Court <br><br> The Honorable Timothy P. Spahr, Judge <br><br> Trial Court Cause Nos. 52C01-1301-JC-3 52C01-1301-JC-4 52C01-1301-JC-5 |

**Brown, Judge.**

[1] C.R. ("Foster Father") and A.R. ("Foster Mother" and together with Foster Father, "Foster Parents") appeal the juvenile court's order denying their motion for the return of Ale.P., Ala.P., and J.P. (collectively, the "Children"). Foster Parents raise two issues which we revise and restate as:

> I. Whether they were deprived of due process; and
>
> II. Whether the court erred in denying their motion for return of the Children.

We affirm.

## *Facts and Procedural History*

[2] On February 6, 2013, the biological parents of the Children admitted that the Children were in need of services, and on March 28, 2013, the Department of Child Services ("DCS") was awarded wardship. The Children were placed in a foster home until July 2013 and then with their paternal grandparents until July 2015 when they were placed with Foster Parents.

[3] On August 5, 2016, the Children were removed from Foster Parents' home and placed in a "Respite Home" before being placed in a new foster home on August 12, 2016. Appellee's Appendix Volume II at 114. Meanwhile, on August 8, Angela Isley, a DCS Family Case Manager Supervisor, several DCS employees, and Foster Parents, were present at a meeting regarding the August 5, 2016 removal.

[4] On August 17, 2016, Foster Parents filed a Motion for Return of Children, Petition for Guardianship, and for Custody. On August 22, 2016, the court

held a hearing and at the beginning stated that it noticed there had not been any formal petition to intervene, referencing Ind. Code § 31-34-21-4.5. DCS's counsel stated that she reviewed the statute and it appeared that long term foster parents do have the right to intervene in a CHINS case. Foster Parents' counsel indicated that he was making a formal motion to intervene. DCS's counsel stated: "No objection, I guess for the purpose of today's hearing, I guess from a DCS standpoint they're no longer the foster parents from, our standpoint, umm but for today's motion I think it's, necessary for them to be here." Transcript Volume II at 5. The court granted the motion to intervene.

[5] After some discussion, Foster Parents' counsel called the Children's grandmother as witness. She testified that she lived with them for over two years and observed J.P. touch his private area one time.

[6] The Children's paternal grandfather testified that he noticed J.P. would always play with himself by touching his penis with his hands. He testified that Ale.P. would masturbate and that he saw her do so "a couple of times, but she was really sneaky." Id. at 13.

[7] Lynn Hausner testified that she worked at Maconaquah Elementary, had Ale.P. "last year and this year," knew Ala.P. from being in the hallway, and met J.P. in passing. Id. at 16. She testified that Ala.P. and Ale.P. were incredibly upset upon learning that they were removed from the Foster Parents and that they expressed to her a desire every day to return to the Foster Parents. When asked

what type of parental figures the Foster Parents had been, she answered that they were involved and "completely there for them." *Id.* at 17.

[8] April Arrowood, a foster care specialist employed by DCS, testified that Foster Mother requested home based therapy from her on several occasions. She testified that DCS represented to the Foster Parents that they would obtain those services, but those services were not provided to her knowledge. On cross-examination, she stated she was not aware of the full extent of services that were in place while the Children were in the Foster Parents' home, and on recross-examination, that she had never spoken to the Children's therapist or any teachers.

[9] When asked about the largest single factor in the decision to remove the Children from the Foster Parents, Isley, a DCS Family Case Manager Supervisor, answered:

> The, and let me clarify if I can that on the day that the children were removed I was not umm part of that decision, the day on the 5th. Umm but I was made aware of was that, during umm, the conversation that Detective Jumper and assessment worker Mooney had with the girls at the school that, that is when they came forward with the information that [Foster Mother] had just hounded them so much, and kept questioning, did your parents do this to you, did your parents do this to you, that they finally just to get out of the room and not talk about it anymore, yes. [Foster Mother has] told us to say this. In regards to that their parents are the ones that sexual [sic] molested them. That was the major factor.

*Id.* at 41. On cross-examination, she testified that the Children were to receive individual therapy every other week but they had missed appointments, and she did not believe the Foster Parents' home was the best place for the Children. When asked about safety concerns, she answered:

> It appears to me that for whatever reason, there is almost an obsession, by [Foster Mother] that these children have been sexually molested and that the parents did it. And it's now been presented to the children, that possibly the last memory or the, what's being told to them is that their parents did something awful to them when we have no proof to back that. Umm, it's, it's concerning that the story . . . as told by one of the children just got more elaborate the more questions that started to be asked. Umm, whether that was on the child's part because they do say the children lie and manipulate all the time, umm which is also concerning because if they lie and manipulate all the time then how do we believe, why are we believing the sexual stuff, but everything else they say is a lie. So there's just lots of umm, there's just lots of questions that don't make sense why, why do these children have to be sexually molested to masturbate.

*Id.* at 49-50. She also testified that she emailed the teachers in part because Foster Mother kept raising a concern that the Children masturbated in school and that the teachers did not state they witnessed any such behavior.

[10] The court appointed special advocate, Alayne Cook ("CASA Cook") testified that the Children made enormous progress with the grandparents and the Foster Parents. She stated her belief that the Children feel stable and secure in the Foster Parents' household and that adoption by them is a very good idea. She testified that she had not seen anything sexual at any time she had been

with the Children.  On cross-examination, she testified that she spoke with the Children's therapist and teachers and that they did not notice anything of concern with respect to sexualized behaviors in the classroom.

On September 2, 2016, the court continued with the hearing.  On cross-examination, Brenda Kay McGinnis, the local office director in Miami County and an employee of DCS, was asked if she believed that the Foster Parents may have emotionally harmed the Children and answered: "Possibly, yes."  *Id.* at 110.  When asked to explain the reasons why the Children were removed from the Foster Parents, she responded:

> The reason the children were removed from the [Foster Parents] was because of the concerns that we had regarding the investigations.  And the fact that it appeared that [Foster Mother], while well intentioned seemed to be questioning the children and, possibly planting in their heads information about sexual abuse that didn't occur.  Consequently what's, what the concern was is she planting information in them (inaudible) her questioning of them, that makes the children believe they've been sexually abused when they've not been.

*Id.*

Foster Mother testified that Ale.P. "squeezed the guts out of a frog" on the first day she was placed with her, which she found "very alarming" and that J.P. was "playing with himself" within two days and "would hump the sofa."  *Id.* at 121.  She also described the sexual behavior of Ala.P. and Ale.P. and said that Ale.P. told her that her mother taught her.  She stated that she asked DCS for additional services with respect to this behavior every day that she was willing

to undergo an exam for reunification and wanted to adopt the Children and that she did not instruct any of the Children to say they had been sexually abused.

[13] On September 27, 2016, the hearing continued. Foster Father testified that he witnessed Ale.P. appear to masturbate in a pool and J.P. appear to masturbate in a bed. After Foster Father's testimony, counsel for Foster Parents rested, and DCS presented evidence.

[14] Lyndi Cook, the Children's case worker, testified that the paternal grandparents did not talk to her about the Children's sexualized behavior during the time the Children were placed with them. On cross-examination, she testified that Foster Mother expressed concerns about the Children's sexual behavior. She also testified that she felt the therapy that was being given was enough to address Foster Mother's concerns. On redirect examination, she stated that no teacher ever came to her about sexualized behavior from the Children, and she recommended that the Children not remain with Foster Parents.

[15] Isley testified that Ale.P. did not report anything to her therapist, Steve Carney, regarding touching herself, that Ala.P. did not disclose any type of sex abuse to Carney, and that Ale.P. disclosed sex abuse only after returning from vacation with Foster Mother. She stated that Carney would not have considered masturbation a misbehavior, and that Carney said that the Children should see someone specialized and "what he was referring was to a CAC, CAC interview which is where someone is trained to discuss with children the good touch bad

touch in an effort umm to see if there's a disclosure of sexual abuse." *Id.* at 215. Two interviews were conducted with the Children and none of the Children disclosed any sex abuse in the first set of interviews, during which the Children were very relaxed during the first set of interviews. She testified that Ale.P. was very anxious when she entered the room for the second interview and asked that Foster Mother sit in the room with her before she talked about anything, which she was told could not happen. Isley testified that she thought "it almost seemed like something that had been rehearsed . . . ." *Id.* at 218. During Ala.P.'s second interview, she "looked scared to death when she walked into the room." *Id.* at 218. She testified that "the only thing that [J.P.] talked about in the second set of interviews was that . . . after that her [sic] had heard several times . . . his mother would be referred to as [A.C.], umm that he heard his mother talking to his sisters . . . about their interviews." *Id.* at 219. Isley further testified that, during interviews of one of the Children at the CAC, Foster Mother was caught in the hallway trying to listen outside the interview door.

[16] Isley also stated she had seen the Children since they had been moved to their current foster home, that they had been playing, they had therapy sessions since moving to the new foster home, that Ale.P. was upset "because she was told that she was only in respite and she wanted to know why she was still there," and that the move "didn't seem to affect" Ala.P. *Id.* at 219-220. She also testified that she had conversations with the current foster parents about whether the Children exhibited any sexualized behavior and that they had not reported any, that the new foster parents reported that Ale.P. and Ala.P. were

becoming more affectionate every day after initially being standoffish, that J.P. told the new foster mother that he loved her, and that the Children were in a pre-adoptive home.

[17] Indiana State Police Detective Michelle Jumper testified that her investigation started following the second CAC interview, that she interviewed Ale.P. and Ala.P., and that details changed including where it happened and items that were used during the abuse. She testified that J.P. stated that she "needed to talk to [Foster Mother] she was the one that seen most of what was going on." Transcript Volume III at 7. She stated that she interviewed Foster Mother and that her "story did change," that Foster Mother "wanted to believe so badly that these kids had been molested," and that "she was obsessed with this whole situation." *Id.* at 9, 12. She also interviewed the biological parents and they were both cleared of being suspects. Detective Jumper also described an incident at a parade in which Foster Mother ran out of the crowd, pointed at the biological mother, and yelled that she was a child molester. Detective Jumper further testified that, during a subsequent conversation with Ale.P., Ale.P. said that "she had been asked over and over and over and over by [Foster Mother] that she had been molested to the point where she said she just said fine, okay my parents molested me." *Id.* at 12. She stated: "I mean Ale.P. said it in her first interview with me that they talked about it every day it was something that she kept asking and asking and asking and that's what [Ale.P.] finally said at the school too. That she finally just threw her hands up and said okay my, my parents molested me." *Id.* at 13. On cross-examination,

Detective Jumper testified that Ale.P. stated that she lies a lot to protect herself, that she had "been having sex with herself," and that the Foster Parents had caught her doing that. *Id.* at 17.

[18] DCS then rested, the CASA rested, and Foster Parents' counsel called CASA Cook in rebuttal, who testified that she still thought the best place for the Children was with Foster Parents. She stated that the "conditions of the home where [the Children] are now are just a shade better that are then [sic] the home [of the biological parents] that they were removed from. It's chaotic and if [sic] I don't think it's clean." *Id.* She also testified that the conditions of the Foster Parents' home were better than the conditions of the home where the Children were currently placed.

[19] After the presentation of evidence, DCS's counsel argued that Foster Parents do not have the same rights as biological parents, that "[i]t is a modification of disposition at best," that following the CHINS finding the Children were wards of the DCS, and that DCS was making decisions it believed are in the best interests of the Children. *Id.* at 37. Foster Parents' counsel stated that "[t]he best interests of the children should always be the concern of the Court and should govern the Court's decision in this case . . . ." *Id.* at 38. The court took the matter under advisement and indicated it would conduct *in camera* interviews of the Children.

[20] On October 10, 2016, the court denied the Foster Parents' Motion for Return of Children, Petition for Guardianship, and for Custody. The order states:

Evidence is heard and concluded, the Court conducts *in camera* interviews with all three children, and the Court takes the matter under advisement.

And now the Court, being duly advised in the premises, **FINDS** and **ORDERS** as follows:

1.  The Court is very concerned by the shifting and typically uncorroborated accounts of the children's alleged behavior that have been provided by Foster Mother in various emails; during a meeting at the Miami County DCS Office on August 8, 2016, that she herself recorded; and during her testimony in open court.

2.  Moreover, at times, Foster Mother has taken actions that reflect both: (a) a surprising lack of restraint; and (b) obsessive and/or compulsive behavior. For example, during the private, recorded interview of one of the children at the Child Advocacy Center in Marion, Indiana, in April 2016 she was discovered to be listening at the door to the interview room. Then, during Peru's circus parade in July 2016, she literally ran four blocks along the parade route and effectively entered the parade itself in order to chase down the children's biological parents, who had passed by earlier while they were participating in the parade. Foster Mother then loudly (and in the presence of other people) made accusations that they had engaged in child molestation.

3.  Although it is undisputed that the Foster Parents have and maintain a nice home, support the children's education, and expose the children to new experiences, after considering the entirety of the evidence that has been presented, the Court cannot conclude that it is in the children's best interests to be returned to the Foster Parents' care.

4. The Foster Parents' Motion for Return of Children, Petition for Guardianship, and for Custody hereby is **DENIED**.

5. The Foster Parents previously have been permitted to intervene without objection from DCS; however, in light of the Court's ruling, that intervention is at an end and they no longer have status as parties to the above-captioned cases, although the Court is of the opinion that they still have standing to seek appellate review of this Court's decision.

6. This Court previously entered an Order on August 22, 2016, that granted the Foster Parents in-person supervised visits and telephonic contact with all three children. The Court now terminates that Order.

Appellants' Appendix Volume II at 27-28.

[21] On November 9, 2016, Foster Parents filed a motion to correct error alleging that DCS did not comply with Ind. Code § 31-34-20-5, did not request an emergency change to the residence of the Children pursuant to Ind. Code § 31-34-23-3, and did not make written documentation pursuant to Ind. Code § 31-34-2-6. They asserted they should not bear the burden of showing that their residence is better for the Children than the residence in which DCS place them, and that the court ceased their intervention and they "move to intervene pursuant to IC 31-34-21-4.5 and should be allowed to intervene as interested parties." *Id.* at 31. Foster Parents ask that we find that the evidence demonstrated it is in the Children's best interests to live with them and order DCS to return the Children to their care.

On November 16, 2016, the court held a permanency hearing. It observed that Foster Parents had filed a motion to correct errors and that it was not taking any action on the motion because the Trial Rules allow fifteen days for a response to be filed. The court scheduled another permanency hearing for February 15, 2017 in December 2016, denied Foster Parents' motion to correct error.

## Discussion

### I.

The first issue is whether Foster Parents were deprived of due process. They argue that the trial court forced them to carry the burden of proof and that "[a]t no time did the Court refer to a burden proof [sic] or cite a legal standard it would use to determine the outcome of the hearing." Appellants' Brief at 17. They contend they could not be heard at a meaningful time and in a meaningful manner if they could not know who had to meet what standard and that DCS should bear the burden because it controlled how much Foster Parents were allowed to know about the placement.

DCS argues that Foster Parents waived their due process arguments because they never raised them with the trial court. DCS also argues that the trial court did not violate Foster Parents' due process rights. DCS contends that the Foster Parents' bore the burden of proof because they were the petitioners. It asserts that the Foster Parents' Motion for Return of Children, Petition for Guardianship, and for Custody uses the same allegations required for a

guardianship and that, in terms of guardianship cases, the petitioner bears the burden to prove "by clear and convincing evidence that the best interests of the child require such a placement" with the guardians. Appellee's Brief at 22 (quoting *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002)). DCS asserts that it had a burden to present evidence to demonstrate that the trial court should not grant Foster Parents' motion and that it did. DCS argues that the Foster Parents were heard in a meaningful time and manner. It also asserts that the Foster Parents could have sought out what they believed to be pertinent evidence through discovery, but did not do so.

[25] "Due process requires 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893 (1976)). The Indiana Supreme Court has previously written that the process due in a termination of parental rights action turns on balancing three *Mathews* factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id.* (citing *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)). The Court held that these same factors apply to a due process analysis of a CHINS adjudication. *Id.*

[26] The Foster Parents' arguments focus on due process in the trial court and not at the time the Children were removed from their care on August 5, 2016.

Accordingly, we examine due process in the context of the juvenile court's actions.[1]

[27] Ind. Code § 31-34-21-4.5 is titled "Foster parent's intervention" and at the time of the Foster Parents' intervention provided:

> (a) Except as provided in subsection (b) a foster parent, long term foster parent,[2] or a person who has been a foster parent may petition the court to request intervention as a party to a proceeding described in this chapter.

> (b) A foster parent who has been:

>> (1) the subject of a substantiated report of child abuse or neglect; or

>> (2) convicted of a felony listed in IC 31-27-4-13;

> may not petition the court to intervene under this section.

---

[1] In their reply brief, the Foster Parents cite Ind. Code §§ 31-34-22-1 and 31-34-22-2 and argue that DCS proposed a change to the residence of the Children without first preparing a modification report and requesting a formal hearing on the proposed modification. Foster Parents cite these statutes and raise this argument for the first time in their reply brief. Foster Parents also mention Ind. Code § 31-34-23-3, but cite it for the first time in their reply brief. The law is well settled that grounds for error may be framed only in an appellant's initial brief and are waived if addressed for the first time in the reply brief. *See Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005). While Foster Parents mentioned Ind. Code §§ 31-34-20-5 and 31-34-2-6 in their motion to correct error, they do not cite these statutes on appeal.

[2] Ind. Code § 31-34-21-4.6 defines a "long term foster parent" as "a foster parent who has provided care and supervision for a child for at least: (1) the twelve (12) most recent months; or (2) fifteen (15) months of the most recent twenty-two (22) months."

> (c) A court may grant a petition filed under this section if the court determines that intervention of the petitioner is in the best interests of the child.

(Subsequently amended by Pub. L. No. 145-2006, § 317 (eff. July 1, 2017)). We also observe that Ind. Code § 31-35-2-6.5 is titled "Notice of Hearing" and provides that "[a]t least ten (10) days before a hearing on a petition or motion under this chapter, the department shall provide notice of the hearing to the child's foster parent . . . ."

[28] The trial court granted Foster Parents' motion to intervene and they presented evidence and cross-examined DCS's witnesses over the course of a three day hearing. To the extent Foster Parents suggest that the trial court improperly had them present evidence first, we observe that at the beginning of the August 22, 2016 hearing, the court stated: "Okay uh this is on your motion and petition [Foster Parents' counsel] so who will be your first witness?" Transcript Volume II at 8. Foster Parents' counsel stated the name of the Children's grandmother and proceeded to question her, and did not object at the beginning of that hearing or at the other hearings. With respect to Foster Parents' argument that the juvenile court did not refer to a burden of proof or cite a legal standard it would use to determine the outcome of the hearing, they do not cite to authority requiring a juvenile court to do so.

[29] To the extent Foster Parents assert that they could not present certain evidence because DCS controlled how much they were allowed to know about the placement of the Children in the new foster home, we note that CASA Cook

testified in the Foster Parents' favor with respect to a comparison of the two homes. Moreover, Foster Parents do not assert that the juvenile court precluded them from obtaining discovery.

[30] After the presentation of evidence and following the argument of DCS's counsel regarding the procedural posture of the case, Foster Parents' counsel stated that "[t]he best interests of the children should always be the concern of the Court and should govern the Court's decision in this case . . . ." Transcript Volume III at 38. We have previously held that "the paramount interest in . . . CHINS cases is the best interests of the child." *In re Adoption of N.W.R.*, 971 N.E.2d 110, 115 (Ind. Ct. App. 2012). In its October 10, 2016 order denying the Foster Parents' Motion for Return of Children, Petition for Guardianship, and for Custody, the court referred to the best interests of the Children. Specifically, the court stated:

> Although it is undisputed that Foster Parents have and maintain a nice home, support the children's education, and expose the children to new experiences, after considering the entirety of the evidence that has been presented, the Court cannot conclude that it is in the children's best interests to be returned to the Foster Parents' care.

Appellants' Appendix Volume II at 28. Given that the trial court used the test proposed by Foster Parents' counsel, we cannot say that reversal is warranted on this basis and cannot say that the Foster Parents were deprived of due process. *See Browder v. Harmeyer*, 453 N.E.2d 301, 309 (Ind. Ct. App. 1983) (addressing the rights of a paternal grandmother, holding that "only parents

need be afforded the increased due process rights inhering in a required finding of unfitness" prior to adoption, observing that paternal grandmother was provided notice of the maternal grandparents' petition for adoption and an evidentiary hearing, and concluding that "this is sufficient due process even if [paternal grandmother] does have a fundamental right to family integrity"), *reh'g denied*; *see also Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 856, 97 S. Ct. 2094, 2115 (1977) (holding that the procedures provided by New York State and New York City were adequate to protect whatever liberty interest individual foster parents may have).

## II.

[31] The next issue is whether the juvenile court erred in denying the Foster Parents' Motion for Return of Children, Petition for Guardianship, and for Custody. Foster Parents argue that, while they are not the biological parents of the Children, cases involving the termination of the rights of biological parents are instructive. They also cite to Ind. Code § 31-35-2-4(b)(2), which governs the termination of parental rights, but state that they do not argue that those standards bind this Court. They assert that there is no proof that they impaired the Children's physical, mental, or social development. They state that Foster Mother was not the only witness who testified regarding the Children's sexual behavior and point to the testimony of Foster Father and the Children's grandfather. They argue that Foster Mother's approach of the door during a CAC interview did not pose harm to the Children. With respect to the incident at the parade, they allege that the crucial fact was that Foster Mother left the

Children beside the parade route when she traveled a few blocks to confront the parents and the Children did not see her communicate to the biological parents. They contend that it is in the Children's best interests for their foster parenthood to continue.

[32] DCS argues that the record supports the trial court's findings of fact that Foster Parents appear to challenge. It asserts that Foster Parents waived their argument that the statutes governing the termination of parental rights are applicable because they raise it for the first time on appeal. It also contends that termination statutes are applicable only when a parents' rights are terminated and that returning the Children to Foster Parents was not in the Children's best interests.

[33] Both parties cite Ind. Trial Rule 52(A), which provides that "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." This review is implemented on appeal by a two-tiered analysis, considering first whether the evidence supports the findings and then whether the findings support the judgment. *In re T.S.*, 906 N.E.2d 801, 804 (Ind. 2009). Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the resulting judgment. *Id.*

[34] The Indiana Supreme Court has held:

[F]oster relationships are designed to be temporary, providing a "safe, nurturing environment" until the child can either be returned to the natural parents or adopted by new ones. Indiana Foster Family Handbook 46 (1995). Furthermore, the foster relationship is contractual; the parents are reimbursed by the State for their care of the children. *See id.* at 101-05.

*Worrell v. Elkhart Cty. Office of Family & Children*, 704 N.E.2d 1027, 1029 (Ind. 1998). We also observe that 465 I.A.C. 2-1.5-3 is titled "Qualifications of the foster family; general" and provides: "Foster parents' ability to meet these competencies shall be reevaluated at each relicensure and at any other time at the discretion of the department or child placing agency."

[35] The court's order stated that it was "very concerned by the shifting and typically uncorroborated accounts of the children's alleged behavior . . . ." Appellants' Appendix Volume II at 27. The record reveals that, while Foster Mother and other relatives reported sexual behavior of the Children, other witnesses testified they did not observe such behavior. DCS Family Case Manager Supervisor Isley testified that she had emailed the teachers in part because Foster Mother kept raising a concern that the Children masturbated in school and that the teachers did not state that they witnessed any such behavior. On cross-examination, CASA Cook testified that she spoke with the Children's therapist and teachers and that they did not notice anything of concern with respect to sexualized behaviors in the classroom. Lyndi Cook, the Children's case worker, testified that the paternal grandparents did not talk to her about the Children's sexualized behavior during the time the Children were placed

with them. She also testified that no teacher ever came to her about sexualized behavior from the Children. We cannot say that the court's finding is clearly erroneous.

[36] The court also stated that Foster Mother's actions reflected "(a) a surprising lack of restraint; and (b) obsessive and/or compulsive behavior." Appellee's Appendix Volume II at 27. The record reveals that DCS Family Case Manager Supervisor Isley testified that Foster Mother "hounded" Ale.P. and Ala.P. regarding the idea that their biological parents sexually molested them to the point that Ale.P. and Ala.P. stated that molestation occurred "just to get out of the room . . . ." Transcript Volume II at 41. Detective Jumper testified that Foster Mother's "story did change," that Foster Mother "wanted to believe so badly that these kids had been molested," and that "she was obsessed with this whole situation." Transcript Volume III at 9, 12. The court also heard testimony regarding the Foster Mother's listening at the door to the interview room and the incident at the parade. Again, we cannot say that the court's findings are clearly erroneous.

[37] While CASA Cook recommended that the Children be returned to Foster Parents' care, others testified that the Children should not be returned. Specifically, Lyndi Cook recommended that the Children not remain with the Foster Parents. When asked if she believed that the Foster Parents may have emotionally harmed the Children, McGinnis, the local office director in Miami County and an employee of DCS, answered: "Possibly, yes." *Id.* at 110. She also testified that the concern was that Foster Mother planted information in

the Children making them believe they had been sexually abused when they had not been. Under the circumstances, we conclude that the juvenile court's judgment is not clearly erroneous.

## *Conclusion*

[38] For the foregoing reasons, we affirm the juvenile court's denial of the Foster Parents' motion for the return of the Children.

[39] Affirmed.

May, J., and Pyle, J., concur.