# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2018, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Frederick A. Turner
Bloomington, Indiana

ATTORNEY FOR APPELLEE

Karen A. Wyle
Bloomington, Indiana

I N   T H E
# COURT OF APPEALS OF INDIANA

B.B.,

*Appellant-Respondent,*

v.

E.W. and K.W.,

*Appellees-Petitioners.*

January 31, 2018

Court of Appeals Case No.
53A04-1705-AD-1113

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin

Trial Court Cause No.
53C07-1511-AD-98

**Pyle, Judge.**

## Statement of the Case

[1]     B.B. ("Biological Father"), who is the biological father of daughter, A.B. ("Child"), appeals the trial court's order that determined that:  (1) Biological Father's consent was not required for the adoption of Child by Child's maternal

grandmother, E.W. ("Adoptive Mother"), and maternal step-grandfather, K.W. ("Adoptive Father") (collectively, "Adoptive Parents"); and (2) adoption was in Child's best interests.

Biological Father argues that the trial court erred by concluding that his consent was not necessary and that adoption was in Child's best interest. Because the record reveals, among other circumstances, that Biological Father had failed to provide Child with care and support for over one year when he was able to do so as required by law or a judicial decree, the trial court did not err by determining that Biological Father's consent to adopt Child was not required. Furthermore, there is sufficient evidence to support the trial court's determination that the adoption was in Child's best interests. Accordingly, we affirm the trial court's order.

We affirm.

## Issues

1. Whether the trial court erred by determining that Biological Father's consent to the adoption was not required.

2. Whether the trial court erred by determining that adoption was in Child's best interest.

## Facts

Biological Father and L.S. ("Biological Mother"), who never married, are the biological parents of Child, who was born in May 2008. Child had a half-sister, E.H. ("Sister"), who was Biological Mother's older child from her marriage to

J.H. ("Stepfather"). For approximately the first two years of Child's life, she lived with Biological Mother, Biological Father, and Sister. Biological Father and Biological Mother had a history of drug use.

In 2010, Biological Mother and Stepfather reconciled, and Child and Sister then lived with them. In July 2011, a methamphetamine lab was discovered in Biological Mother and Stepfather's house, and Child and Sister were removed from the home by the Indiana Department of Child Services ("DCS"). Child and Sister were then determined to be children in need of services ("CHINS"), and DCS placed them with Adoptive Parents. At that time, Biological Father was on probation from a domestic battery conviction and, prior to that, had spent three days in an intensive care unit after using bath salts.

Throughout his life, Biological Father has used various illegal substances, including cocaine, methamphetamine, amphetamines, opiates, and marijuana. During the CHINS proceeding, DCS referred Biological Father for a substance abuse assessment. Biological Father had visitation with Child, but she was fearful of him when he became angry.

Biological Father was frequently angry during DCS team meetings. In June 2012, Biological Father yelled during a meeting, told Adoptive Mother that she could just take Child, and then walked out of the meeting. Thereafter, Biological Father did not visit with Child for three months. Child was convinced that Biological Father was dead because he had told her that he

would stop visiting her only if he died. Later, DCS filed a petition to terminate the parental rights of Biological Father and Biological Mother.

[8] Subsequently, in April 2013, Biological Father, Biological Mother, Adoptive Mother, and DCS entered into a Mediation Agreement regarding Child.[1] Among other terms, the parties agreed that: (1) the CHINS case would be discharged and the termination of parental rights petition would be dismissed; (2) Adoptive Parents would have physical custody of Child and would share legal custody of her with Biological Father; (3) Biological Father was to have regular, unsupervised parenting time with Child, including every other weekend; (4) Biological Mother was to have supervised parenting time with Child and was subject to drug screens; (5) Biological Father and Biological Mother were not required to pay child support for Child, and Adoptive Parents would be able to claim any tax credit, exemptions, or deductions for Child; and (6) Biological Father, Biological Mother, and Adoptive Mother would each pay one-third of Child's unreimbursed health care expenses, school fees and expenses, extra-curricular expenses, and summer camps.[2] The trial court approved the Mediation Agreement.

---

[1] The Mediation Agreement was later amended in July 2013.

[2] The Mediation Agreement also contained an agreement among Biological Mother, Stepfather, Adoptive Parents, and DCS regarding Sister.

When Child went to Biological Father's house for parenting, he usually had his girlfriend, D.H. ("D.H."), watch Child.[3] Biological Father, who worked as a limousine driver at that time, sometimes took Child in the limo with him until 4:00 a.m. and had women in the limo watch Child. Biological Father also continued to use drugs. In December 2013, D.H. caught Biological Father snorting crushed Adderall pills.

Also in 2013, after the parenting time in the Mediation Agreement had been implemented, Adoptive Mother noticed that Child began exhibiting troubling behaviors. For example, Child was crying in her sleep, bedwetting, acting out aggressively, getting upset and hitting herself, and exhibiting sexual behavior such as fondling herself. In June 2013, Adoptive Mother took Child to Susie's Place, where she was interviewed.

On various occasions, Adoptive Mother requested Biological Father to pay one-third of Child's unreimbursed expenses as set forth in the Mediation Agreement. Biological Father's girlfriend, D.H., made a payment for Biological Father in January 2014. However, despite several requests from Adoptive Mother, Biological Father never made any other payments for his one-third portion of Child's expenses.

In 2014, Biological Father's drug use escalated. He and Biological Mother moved back in together, and they both used drugs, including an "[e]xcessive

---

[3] Biological Father had two other children with his girlfriend.

amount" of methamphetamines. (Tr. Vol. 2 at 96). Biological Father did not have any significant contact with Child after June 2014.

[13] In June 2014, Adoptive Mother sent Biological Father an email requesting him to pay his one-third portion of Child's therapy expense, which was $53.00. In July 2014, Adoptive Mother sent Biological Father another email requesting him to pay his one-third portion of Child's summer camp expense, which was $153.00. Biological Father did not pay his portion of these expenses for Child.

[14] On July 15, 2014, the trial court issued an order and temporarily suspended Biological Father's parenting time until he showed that he had participated in substance abuse treatment and was benefitting from the treatment. The trial court also awarded sole physical and legal custody of Child to Adoptive Parents.

[15] In November 2014, Adoptive Parents obtained a protective order against Biological Father after he had made statements that he wanted to kill Adoptive Parents and take Child. Specifically, Biological Father told D.H. that if he had his way, he would slit everyone's throats at Adoptive Parents' house and take Child away from there. Biological Father initially objected to the protective order, but he failed to appear at the hearing to challenge it because he was getting high.

[16] Thereafter, Biological Mother broke up with Biological Father, and she made efforts to become sober. Subsequently, in February 2015, Adoptive Mother started to let Biological Mother have visitation with Child. Biological Mother's

visits are contingent upon her passing a drug screen administered by Adoptive Mother.

[17] In February 2015, Biological Father was charged with Level 5 felony burglary and Level 6 felony auto theft. A warrant was issued for Biological Father's arrest, and he eventually turned himself in to police in March 2015. He was then incarcerated and was later released from jail in Summer of 2015. Biological Father was then accepted into Monroe County Drug Treatment Court ("drug court") based on his admission that he had drug-related issues at the time he pled guilty to the pending criminal charges.

[18] Thereafter, the drug court referred Biological Father for a clinical evaluation. During this evaluation, then forty-two-year-old Biological Father reported that, throughout his life, he had used various illegal substances, including cocaine, methamphetamine, amphetamines, opiates, marijuana, and bath salts. He had first tried marijuana and alcohol at age seventeen. He drank alcohol until March 2015 and reported that he would consume four drinks every few hours. Biological Father also reported that he had first used methamphetamine at age twenty-four, cocaine at age twenty-six, and amphetamines at age forty. He reported that he had used a lot of these drugs and had last used them in March 2015.

[19] Also in the Summer of 2015, Biological Father filed a petition to reinstate his parenting time with Child. At that time, he had not seen Child for one year. Thereafter, Biological Mother shared with Adoptive Mother some of her

concerns about Child's "future with her dad and the potential harm that it might bring." (Tr. Vol. 1 at 240). After some discussion, Biological Mother decided that "the best option for [Child's] future and for her safety" was for Adoptive Parents to adopt Child, and she agreed to consent to the adoption. (Tr. Vol. 1 at 240).

[20] In September 2015, Adoptive Mother sent Biological Father a certified letter and requested that he pay his portion of the previously submitted bills, of which his portion was $451. These bills included Child's therapy bill, summer camp fees for 2014 and 2015, and school book fees. Biological Father did not pay anything to Adoptive Mother.

[21] Thereafter, on November 23, 2015, Adoptive Parents filed a petition to adopt Child. Biological Mother signed a consent to the adoption of Child by Adoptive Parents. In Adoptive Parents' petition, they alleged that Biological Father's consent was not required under INDIANA CODE § 31-19-9-8(a) because Biological Father: (1) was unfit and that the best interest of Child would be served if the trial court dispensed with his consent; (2) had failed to communicate significantly with Child for over one year when he was able to do so; and (3) had failed to provide Child with care and support for over one year when he was able to do so. *See* IND. CODE §§ 31-19-9-8(a)(2), 31-19-9-8(a)(11).

[22] In January 2016, Biological Father saw Child when she went to the ice cream shop where he worked. He also saw Child at the ice cream shop in July 2016. During this second visit, Biological Father took photos of Child and called his

girlfriend, D.H., so that Child could talk to her. During these two interactions, the protective order against Biological Father was still in effect.

[23] In February 2016, Biological Father sent the trial court a letter, stating that he wanted to contest the adoption and requesting counsel to be appointed. The trial court appointed counsel for Biological Father, and he then filed a formal motion to contest the adoption. In the motion, Biological Father alleged that he was "a fit parent" and that it was "not in the best interest of [Child] for this adoption to be granted." (App. Vol. 2 at 36).

[24] In June 2016, the trial court appointed a mediator and referred the case to the Family Court Mediation Clinic. Additionally, the trial court set a hearing date to discuss the topics of "consent and best interests[.]" (App. Vol. 2 at 6). The trial court also appointed a guardian ad litem ("GAL").

[25] In October 2016, while still under supervision by the drug court, Biological Father had a positive drug screen, and he was placed in jail. Biological Father asserted that he had not used any drugs and that the positive result was because he had eaten a poppy seed muffin, even though he had been warned not to eat poppy seeds.

[26] In October 2016, Adoptive Father took Child to a picnic at a park, and Biological Father came across the park and sat at a picnic table near where they were seated. Child became scared and "was trembling[.]" (Tr. Vol. 1 at 181). The protective order was still in effect at that time.

[27] After granting various continuances, the trial court held two days of hearings in March 2017 on the issues of consent and best interest. The parties stipulated to the admission of twenty exhibits, including Biological Father's paystubs and other financial information. The parties also stipulated to the admissibility of Biological Father's counseling records and to the admission of the GAL report, in which the GAL opined that it was in Child's best interest to be adopted by Adoptive Parents.

[28] During the hearing, Biological Father testified that From June 2014 until March 2015, he spent his time "[g]etting high." (Tr. Vol. 2 at 103). Adoptive Parents' attorney questioned Biological Father about his failure to pay one-third of Child's expenses. Biological Father admitted that he knew that Child would have had expenses but stated that "all[] [he] cared about was getting high." (Tr. Vol. 2 at 132). Father also testified that he did not remember seeing Adoptive Mother's emails requesting that he pay his one-third portion of Child's expenses because it was during the "part of the time when [he] was high[.]" (Tr. Vol. 2 at 129).

[29] Biological Mother testified that she was with Biological Father when he received one of Adoptive Mother's emails requesting payment for Child's expenses. She further testified that Biological Father had expressed disbelief that Adoptive Mother wanted him to "pay all this" when he was not seeing Child. (Tr. Vol. 2 at 186).

[30]    During the hearing, D.H. testified that she had also obtained a protective order against Biological Father in 2014. She also testified that she allowed Biological Father to currently have visitation with their son but that the visitation was supervised by her.

[31]    Adoptive Mother testified that she believed adoption to be in Child's best interest because Adoptive Parents were able to provide a "stable and loving" home for Child and that she had "flourished in [their] care[.]" (Tr. Vol. 1 at 227). Adoptive Mother also testified that, in Biological Father's absence, Child no longer showed "signs of distress" such as nightmares and picking at her legs. (Tr. Vol. 1 at 227). At the end of the hearing, the trial court took the matter under advisement.

[32]    Thereafter, on April 27, 2017, the trial court issued an order, concluding, in part, that Biological Father's consent to the adoption was not required under three separate subsections of INDIANA CODE § 31-19-9-8(a).[4] In relevant part, the trial court made the following conclusions regarding INDIANA CODE § 31-19-9-8(a)(2)(B):

> 2. For a period of at least one year, [Biological Father] knowingly failed to provide for the care and support of [Child] when able to do so as required by law or judicial decree.
>
> 3. [Biological Father] admits that he failed to pay [Child's] expenses as required in the Mediation Agreement. This

---

[4] The trial court concluded that Biological Father's consent was not required under INDIANA CODE § 31-19-9-8(a)(2)(A), INDIANA CODE § 31-19-9-8(a)(2)(B), and INDIANA CODE § 31-19-9-8(a)(11).

agreement was approved, with modification, on July 25, 2013. With the exception of a single payment made by his girlfriend in January, 2014, [Biological Father] has failed to pay his portion of the expenses.

4. [Biological Father] has been employed sporadically since 2013. By his own admission, he used the money that he earned in 2014 and 2015 to purchase drugs, not to support his child. After he obtained employment following his release from incarceration in July, 2015, he made no payment to [Adoptive Parents]. Clearly, [Biological Father] had the ability to provide for the care and support of [Child] and chose not to do so.

(App. Vol. 2 at 98). Additionally, the trial court determined that the adoption of Child by Adoptive Parents was in Child's best interests.[5] Biological Father now appeals.

# Decision

[33] Biological Father challenges the trial court's conclusions that: (1) his consent to Child's adoption is not required; and (2) the adoption was in Child's best interests. We will address each argument in turn.

[34] Our Indiana Supreme Court has set forth our standard of review for adoption proceedings as follows:

> When reviewing adoption proceedings, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption. We generally give considerable deference to the trial court's decision in family law matters,

---

[5] The trial court entered its order as a final judgment under Indiana Trial Rule 54(B).

because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, get a feel for the family dynamics, and get a sense of the parents and their relationship with their children. We will not disturb the trial court's ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. The trial court's findings and judgment will be set aside only if they are clearly erroneous. A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. We will neither reweigh the evidence nor assess the credibility of witnesses, and we will examine only the evidence most favorable to the trial court's decision.

*In re Adoption of O.R.*, 16 N.E.3d 965, 972-73 (Ind. 2014) (internal quotation marks and citations omitted).

[35] Where, as here, the trial court makes findings of fact and conclusions of law, we apply a two-tiered standard of review. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). "[W]e must first determine whether the evidence supports the findings and second, whether the findings support the judgment." *Id.* (internal quotation marks and citation omitted). *See also* Ind. Trial Rule 52(A). "Factual findings are clearly erroneous if the record lacks any evidence or reasonable inferences to support them[.]" *In re Adoption of T.L.*, 4 N.E.3d at 662 (internal quotation marks and citation omitted). "[A] judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings." *Id.* (internal quotation marks and citation omitted).

## 1. Consent

[36]     Generally, a trial court may not grant a petition for adoption without the consent of the child's biological parents. *See* IND. CODE § 31-19-9-1(a). *See also In re Adoption of O.R.*, 16 N.E.3d at 973. There are, however, exceptions to this general rule. INDIANA CODE § 31-19-9-8 provides that "[c]onsent to adoption . . . is not required from, among others, any of the following:

> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
> > (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
> >
> > (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.
>
> * * * * *
>
> (11) A parent if:
>
> > (A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and
> >
> > (B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

I.C. § 31-19-9-8(a). "The burden to prove th[ese] statutory criteri[a] . . . by clear and convincing evidence rests squarely upon the petitioner seeking to adopt." *In re Adoption of T.L.*, 4 N.E.3d at 662 & 662 n.3.[6]

[37] This statute, INDIANA CODE § 31-19-9-8, "is written in the disjunctive such that the existence of any one of the circumstances provides sufficient ground to dispense with consent." *In re Adoption of O.R.*, 16 N.E.3d at 973. Here, the trial court concluded that Biological Father's consent was not required under all three of the above-referenced statutory subsections. Because we conclude that the trial court properly relied on at least one statutory subsection—i.e., INDIANA CODE § 31-19-9-8(a)(2)(B)—we will not address the other subsections found by the trial court. *See id.* (explaining that because INDIANA CODE § 31-19-9-8(a) is written in the disjunctive, appellate courts need address only one of the subsections relied upon by the trial court for concluding that the parent's consent to adoption was not required).

[38] Biological Father contends that the evidence was not sufficient to support the trial court's conclusion, under INDIANA CODE § 31-19-9-8(a)(2)(B), that for a

---

[6] Biological Father contends that our Court should proceed with a de novo review because the trial court's order lacked a specific indication that it had applied a clear and convincing burden of proof. We disagree. First, Biological Father does not cite to any case law or statute that requires a trial court to specifically refer to a burden of proof in its order. *See Matter of Ale.P.*, 80 N.E.3d 279, 287 (Ind. Ct. App. 2017) (rejecting the appellants' argument that the court was required to refer to a burden of proof when making its determination and noting that the appellants failed to cite to any authority requiring the court to do so). Moreover, "[w]e presume that trial courts know and follow the applicable law." *Thurman v. State*, 793 N.E.2d 318, 321 (Ind. Ct. App. 2003). *See also Moran v. State*, 622 N.E.2d 157, 159 (Ind. 1993) (explaining that it is presumed that trial courts apply the correct burden of proof). Furthermore, we do not find that the trial court's order was lacking in any manner; to the contrary, the trial court's order was comprehensive and sufficiently detailed.

period of at least one year, Biological Father knowingly failed to provide for the care and support of Child when able to do so as required by law or judicial decree.

[39] When determining, under INDIANA CODE § 31-19-9-8(a)(2)(B), whether a non-custodial parent has failed to support his child, "the relevant time period is not limited to either the year preceding the hearing or the year preceding the petition for adoption, but is any year in which the parent had an obligation and the ability to provide support, but failed to do so." *In re Adoption of J.T.A.*, 988 N.E.2d 1250, 1255 (Ind. Ct. App. 2013). In addition to showing a non-custodial parent's failure to support, "[a] petitioner for adoption must show that the non-custodial parent had the ability to make the payments which he failed to make." *In re Adoption of M.S.*, 10 N.E.3d 1272, 1280 (Ind. Ct. App. 2014) (quoting *In re Augustyniak,* 508 N.E.2d 1307, 1308 (Ind. Ct. App. 1987) (opinion on rehearing), *trans. denied*), *reh'g denied*, *trans. denied*. "This ability cannot be adequately shown by proof of income standing alone[;]" instead, "[t]o determine that ability, it is necessary to consider the totality of the circumstances." *Id.* (internal quotation marks omitted).

[40] Regarding the statutory determination under INDIANA CODE § 31-19-9-8(a)(2)(B), the trial court made the following relevant findings of fact:

> 15. Section V(A) of the Mediation Agreement provided that [Biological Father] would not be required to pay child support. However, Section V(B)(2) provided that [Biological Father] must pay one-third of all of [Child's] "unreimbursed health care

expenses, school fees and expenses, extracurricular expenses, and summer camps."

* * * * *

30. As previously noted, the Mediation Agreement required [Biological Father] to pay one-third of all of [Child's] "unreimbursed health care expenses, school fees and expenses, extracurricular expenses, and summer camps."

31. [Adoptive Parents] sent correspondence to [Biological Father] in 2014 and 2015, by email and regular mail, requesting payment for total expenses of $451 – [Biological Father's] one-third share of the expenses as set forth in the Mediation Agreement.

32. [Biological Father] admits that he never paid the expenses as required by the Mediation Agreement. He does note that [D.H.], his girlfriend, made a payment to [Adoptive Parents] on his behalf in January, 2014. No other payment has been made.

33. [Biological Father] testified that he did not receive requests for payment from [Adoptive Parents]. However, [Biological Mother] was present in April or May, 2014, when [Biological Father] received a request from [Adoptive Mother] to pay the expenses he was required to pay pursuant to the Mediation Agreement. The Court does not accept [Biological Father's] testimony as truthful.

34. [Biological Father] testified that he did not pay the expenses because [Adoptive Parents] have a protection order against him which prevents him from contacting them. There is no evidence that the protective order prevented [Biological Father] from meeting his financial obligation to [Child].

35. [Biological Father] has been employed sporadically since 2013. Although he initially testified that he did not have the money to make payments in 2014 and 2015, [Biological Father] subsequently admitted that he had money, but used this money

> to purchase drugs. Further, [Biological Father] was employed following his release from incarceration in July, 2015 to the date of the filing of the Petition for Adoption on November 23, 2015. He failed to use any of his earnings to make payments to [Adoptive Parents] on behalf of [Child].

(App. Vol. 2 at 93, 97).

[41] Biological Father contends that Adoptive Parents "can[]not now complain that [Biological] Father has not paid support" because he was not required to pay child support under the Mediation Agreement. (Biological Father's Br. 18). It appears that Biological Father is misconstruing the language of subsection (a)(2)(B) by suggesting that the subsection applies only to child support. This statutory subsection, however, applies when a non-custodial parent "knowingly fails to provide for the *care and support* of the child when able to do so *as required by law or judicial decree*." I.C. § 31-19-9-8(a)(2)(B) (emphases added).

[42] Here, Biological Father had a court-ordered financial obligation—as set forth in the Mediation Agreement approved by the trial court in 2013—to pay one-third of Child's expenses. Aside from one payment made by Biological Father's girlfriend in January 2014, Biological Father did not pay any money to Adoptive Parents for Child's care and support despite their requests for his one-third contribution. Additionally, the record reveals that Biological Father was employed as a limousine drive and at an ice cream store. During 2014 and 2015, Biological Father admittedly only "cared about getting high[,]" and did not make any payments for Child's expenses despite his realization that Child would have had expenses. (Tr. Vol. 2 at 132). Furthermore, even though he

was working, Biological Father did not make any payments even up to the time of the adoption hearing in 2017.

[43] Biological Father also challenges two of the trial court's findings of fact regarding his lack of care and support. Specifically, Biological Father challenges findings 32 and 34, asserting that the trial court erred by finding that he admitted that he had not paid expenses as required under the Mediation Agreement and by finding that there was no evidence that the protective order prevented him from meeting his financial obligation. A review of the record reveals that the trial court's findings were not clearly erroneous and that Biological Father's arguments are nothing more than a request to reweigh the evidence and reassess witness credibility, which we will not do. *See In re Adoption of O.R.*, 16 N.E.3d at 973.[7]

[44] Sufficient evidence supports the trial court's determination that Biological Father knowing failed to provide care and support as required by the Mediation Agreement despite an ability to do so. Accordingly, the trial court did not err by determining that his consent to the adoption was not required under

---

[7] Biological Father also challenges other findings of fact. We need not address these findings as they relate to the subsections of the statute that we are not addressing because of our consideration of subsection (a)(2)(B). *See In re Adoption of O.R.*, 16 N.E.3d at 973 (explaining that because INDIANA CODE § 31-19-9-8(a) is written in the disjunctive, appellate courts need address only one of the subsections relied upon by the trial court for concluding that the parent's consent to adoption was not required). We do, however, note that Biological Father set forth some of his challenges to the findings with an inappropriate sarcastic tone. For example, when challenging the trial court's witness credibility determination of Biological Father's testimony, Biological Father asserted that trial court did "nothing less than assert[] that it is a human polygraph machine." (Biological Father's Br. 13). We find that such tone inappropriate in an appellate brief. *See Pistalo v. Progressive Cas. Ins. Co.*, 983 N.E.2d 152, 160 (Ind. Ct. App. 2012) (cautioning appellate counsel that aggressive and sarcastic tone used in an appellate argument "serves no productive purpose."), *trans. denied*.

INDIANA CODE § 31-19-9-8(a)(2)(B), and we affirm the trial court's determination. *See, e.g.*, *In re Adoption of T.L.*, 4 N.E.3d 658, 663 (Ind. 2014) (affirming the trial court's determination that the father had knowingly failed to provide for the care and support of the child when able to do so where the evidence showed that father had a history of non-payment despite being under a child support order); *In re Adoption of J.L.J.*, 4 N.E.3d 1189, 1197 (Ind. Ct. App. 2014) (holding that there was sufficient evidence supported the trial court's determination that the father's consent was not required based on his failure to provide care and support), *trans. denied*.

## 2. Best Interests

[45] Biological Father also challenges the trial court's determination that adoption was in Child's best interests.

[46] "'[E]ven if a court determines that a natural parent's consent is not required for an adoption, the court must still determine whether adoption is in the child's best interests.'" *In re Adoption of O.R.*, 16 N.E.3d at 974 (quoting *In re Adoption of M.S.,* 10 N.E.3d at 1281 (citing I.C. § 31-19-11-1(a)(1))). Indeed, "[t]he primary concern in every adoption proceeding is the best interests of the child." *In re Adoption of M.S.,* 10 N.E.3d at 1281. Because the "adoption statute does not provide guidance for which factors to consider when determining the best interests of a child in an adoption proceeding," we have used the factors discussed in termination of parental rights cases given the "strong similarities between the adoption statute and the termination of parental rights statute in

this respect." *Id.* As such, we have explained that a determination of the best interest of a child in an adoption proceeding should include consideration of "the totality of the evidence" and "[r]elevant factors[,]" including, "among others, a parent's historical and current inability to provide a suitable environment for the child . . .; the recommendations of the child's case worker or guardian ad litem; and the child's need for permanence and stability[.]" *Id.*

[47] Regarding a determination of Child's best interest, the trial court made, among others, the following relevant findings of fact:

> 36. [Child] and her sister have lived with [Adoptive Parents] for most of [Child's] life. [Adoptive Parents] are kind and loving with the children. They regularly engage in activities, including camping, theater, and painting.
>
> 37. Although [Child] suffered from behavior problems when first placed with [Adoptive Parents], her behavior has greatly improved. As noted by . . . a neighbor, the difference is like "night and day."
>
> * * * * *
>
> 39. The Guardian ad litem notes that [Child] has lived with [Adoptive Parents] continuously since August, 2011. She is thriving in their care. They function as a family unit. The Guardian ad litem believes that adoption by [Adoptive Parents] is in [Child's] best interests. The Court accepts this conclusion as accurate.

(App. Vol. 2 at 97).

[48] Biological Father does not challenge any of these findings, and he acknowledges that Child "is doing well with [Adoptive Parents.]" (Biological

Father's Br. 21). Instead, he contends that the trial court erred by determining that adoption was in Child's best interest because Adoptive Parents did not present specific evidence regarding "the impact of the adoption on the Child's life[.]" (Biological Father's Br. 21). In support of his argument, he cites to *In re Adoption of K.S.*, 980 N.E.2d 385 (Ind. Ct. App. 2012).

[49] In that case, our Court held that a mother's consent to adoption was not required under INDIANA CODE § 31-19-9-8(a)(2)(B) because she had failed to pay support for her child for more than one year, and we reversed the trial court's determination concluding otherwise. *In re Adoption of K.S.*, 980 N.E.2d at 389. When discussing the best interest consideration of the adoption case, we stated that "in evaluating the parent-child relationship, the best interest of the child is paramount and our main concern should lie with the effect of the adoption on the reality of the minor child's life." *In re Adoption of K.S.*, 980 N.E.2d at 389. We noted that, during the adoption hearing, the parties and the trial court had addressed only the consent issue and left the best interest determination for a later time. Accordingly, we remanded the case to the trial court for further proceedings and a determination of whether the adoption was in the child's best interests. *Id.* at 389-90.

[50] Here, unlike *In re Adoption of K.S.*, the Adoptive Parents presented evidence regarding Child's best interests and the effect of adoption on her life, and the trial court specifically determined that the adoption was in her best interests. Furthermore, a review of the record supports the trial court's determination. More specifically, the record reveals that Child was placed in Adoptive Parents'

home in 2011 when she was three years old and that she has lived in their home ever since. Child was removed from her home when a methamphetamine lab was discovered in Biological Mother and Stepfather's home. At that time, Biological Father had been convicted of domestic battery, and he had a history of drug use. During the CHINS proceeding, Biological Father continued to abuse drugs and had extended periods of time when he did not visit with Child.

[51] Also during the CHINS proceeding, Child exhibited "symptoms of stress[,]" including "finger chewing, stomachaches, and nightmares." (App. Vol. 2 at 93; Adoptive Parents' Ex. 1 at 226). Child expressed that she was scared of Biological Father when he got angry. Biological Father exhibited outbursts during CHINS meetings. Biological Father obtained shared legal custody of Child and unsupervised parenting time under the Mediation Agreement in 2013. However, that custody was taken away and his parenting time was suspended in July 2014 because of his drug use, including methamphetamine and amphetamines.

[52] Later, Adoptive Parents obtained a protective order against Biological Father after he had stated that he wanted to slit the throats of Adoptive Parents and take Child from their home. Biological Father violated the protective order on multiple occasions. Additionally, from June 2014 and March 2015, Biological Father admittedly spent his time "[g]etting high." (Tr. Vol. 2 at 103). In February or March 2015, Biological Father was charged with burglary and auto theft. He pled guilty, was incarcerated for a few months, and then entered drug court, in which he was participating at the time of the adoption hearing.

[53] During the adoption hearing, Adoptive Mother testified that Adoptive Parents were able to provide a "stable and loving" home for Child and that she had "flourished in [their] care[.]" (Tr. Vol. 1 at 227). Adoptive Mother also testified that, in Biological Father's absence, Child no longer showed "signs of distress" such as nightmares and picking at her legs. (Tr. Vol. 1 at 227). Additionally, the GAL opined that it was in Child's best interest to be adopted by Adoptive Parents. Considering these factors, we conclude that the trial court did not err by determining that adoption was in Child's best interest. *See, e.g.*, *In re Adoption of O.R.*, 16 N.E.3d at 975 (affirming the trial court's best interest determination in an adoption proceeding); *In re Adoption of M.S.*, 10 N.E.3d at 1282 (finding no error in the trial court's best interest determination).

[54] In summary, we affirm the trial court's determinations that Biological Father's consent to Child's adoption was not required and that adoption was in Child's best interests.

[55] Affirmed.

Riley, J., and Robb, J. concur.